IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| United States of America, ) | |
| ) | |
| Plaintiff, ) | Case No: 16 CR 50004 |
| ) | |
| v. ) | |
| ) | Judge Philip G. Reinhard |
| Darrien Spates, ) | |
| ) | |
| Defendant. ) | |

**ORDER**

For the following reasons, defendant's motion to suppress [41] is denied. Within 10 days the lawyers are to confer whether this case will proceed to a trial or a guilty plea. The court's courtroom deputy shall thereafter be contacted to schedule a date for a guilty plea or status for a trial.

**STATEMENT-OPINION**

On November 15, 2017, defendant filed a motion to suppress in this case [41], arguing that officers violated his Fourth Amendment rights by entering his apartment under an unnecessary and unlawful protective sweep which turned into a warrantless search. He further argues the consent to search given by his girlfriend, Jennifer McKinney ("McKinney"), was coerced. On December 5, 2017, the government filed a response to defendant's motion. *See* [45]. A hearing on the motion to suppress was held on December 20, 2017. Defendant filed a post-hearing memorandum on April 4, 2018 [57] and the government filed a response memorandum on April 25, 2018 [61]. This matter is now ripe for the court's review.

**I. Factual Background.**

As an initial matter, when considering the factual background of this case, the court draws on the testimony of McKinney and three police officers that testified at the suppression hearing. The court also takes into account an affidavit filed by defendant with his motion to dismiss; however, that affidavit addresses only his statement that he was staying at McKinney's apartment for several days prior to November 3, 2015, and that numerous items of his personal property and effects were at that apartment on November 3.[1] Because the resolution of a motion to suppress is a fact-specific inquiry, the court makes credibility determinations based on the witnesses' demeanor and the consistency of their testimony with each other and during cross

---

[1] Defendants' affidavit appears to address facts relevant to the issue of standing. At the evidentiary hearing, the government conceded standing; therefore, defendant's affidavit is not highly relevant to the court's ruling.

1

examination. *United States v. Thompson*, 496 F.3d 807, 808 (7th Cir. 2007); *United States v. Sands*, 815 F.3d 1057, 1061 (7th Cir. 2015) ("Credibility determinations made by the district court are clearly erroneous only if they are 'completely without foundation.'").

The following is a brief recitation of the relevant facts based on the court's credibility assessment of McKinney and the three officers' testimony.

On November 3, 2015, Rockford police officers Erdal Kaya and Joshua Carpenter responded to a 911 call at 1034 Benton Street, Apartment 4. A downstairs tenant of the Benton Street residence told the police he called 911 after hearing a gun shot coming from the upstair apartment. Shortly after hearing the shot, the downstairs resident said he heard someone moving in the upstairs apartment and then saw a black male coming downstairs from that apartment and walking around the yard. After that, he heard someone going back upstairs. Officers Kaya and Carpenter arrived at the residence at approximately 9:30 p.m. and went directly to the upstairs apartment where they knocked on the door. When the defendant came to the door, Officer Kaya recognized him immediately as having a warrant out for his arrest. Defendant stepped out onto the porch area outside the door and Officer Kaya placed defendant under arrest by securing him with handcuffs and searched his person. Officer Kaya located a spent .40 caliber shell casing in defendant's right front pocket. Officer Kaya did not locate a weapon on defendant. While being placed under arrest and searched, defendant told the officers that there was a six-year-old child inside the apartment. He further told the officers there was no one else in the apartment. The officers testified that based on their training and experience, individuals who speak with law enforcement officers sometimes lie to the police. Following his search of defendant's person, Officer Kaya secured defendant inside his squad car.

Within minutes, Officer Duane Johnson and other officers arrived at the house. Since defendant had told the officers the child's name, the officers began calling the child's name into the apartment, but the child did not respond. Officers Carpenter and Johnson, along with another officer, then entered the upstairs apartment. Once inside the apartment, the officers went from room to room and looked in any place where a person could hid. The officers found the six-year-old child on the couch in the main living room area of the apartment. Officer Johnson took the child downstairs to his mother, Jennifer McKinney. The officers then left the apartment. This sweep of the apartment lasted between one and two minutes. During this sweep, the officers did not see a weapon; however, Officer Carpenter saw what he believed to be drugs and drug paraphernalia. Officer Johnson testified that at the time he believed there was potentially a weapon in the apartment. He also testified a child in an apartment with a firearm could pose a variety of dangers to the child and to others.

After bringing the child downstairs and outside, Officer Johnson joined Officer Kaya who was speaking with McKinney. McKinney was the tenant of the upstairs apartment where she lived with her child. Defendant, who had been a friend of McKinney's since childhood, had been staying at her apartment for several previous nights and had some personal belongings at her apartment. On the night of defendant's arrest, McKinney was next door with her landlord and another woman helping the landlord clean that property. At some point in the evening, she

heard police officers outside her apartment and the woman she was cleaning with heard the officers calling out McKinney's child's name. Once outside, a police officer brought McKinney's son to her. Officer Kaya then spoke with McKinney and she provided him with a signed written consent form to search her apartment.

      Officer Kaya testified his conversation with McKinney was short. McKinney was 27 years old at the time, was a high school graduate, and could read and write English. Officer Kaya asked McKinney if she knew if there were any firearms in her apartment and she said she did not know of any. He then asked her if she would agree to a search of her apartment. Officer Kaya believed McKinney knew and understood the written consent form, she agreed to the search of her apartment the first time Officer Kaya requested, she was not surrounded by police officers nor was she handcuffed or in police custody. No one made any physical contact with McKinney, told her she was not free to go, or told her that officers already knew there was a gun in her apartment. Officer Kaya testified that while he could not recall all the details of his interaction with McKinney, he typically followed the same procedure when attempting to obtain a person's consent to search. His procedure was to explain the consent form, fill out any necessary information, and ask the person to sign the form and note the time. He also testified that he routinely advised the person to read the form before signing and would explain to them their right to refuse consent. Additionally, as a mandated reporter, Officer Kaya would advise a parent that he will call the Department of Children and Family Services ("DCFS") if he believes a minor may be in danger. Officer Kaya did not recall if he told McKinney that he would be contacting DCFS, but he testified it would be his practice to do so if a minor is located in a residence with a gun. It was Officer Kaya's practice to advise parents that DCFS will be contacted and would investigate, but he would not tell them that DCFS would be taking away their child. Officer Kaya did not recall telling McKinney that it would look incriminating for her or that DCFS would take away her child if she did not sign the consent form. Officer Johnson was present when Officer Kaya was speaking with McKinney and spoke with her only briefly. Officer Johnson made no threats to McKinney, did not tell her that her child would be taken from her or that she would look guilty if she did not sign the consent form. Officer Johnson did not tell McKinney that it would be in her best interest to sign the form.

      McKinney testified she signed the consent search form and wrote in the time of her signature. She testified she did not read the form and could not recall if any officer advised her that she did not have to sign. However, McKinney testified she knew she could refuse consent. McKinney testified that the officers advised her that DCFS would be notified because it was harmful for her child to be in an apartment with weapons. She testified the officers told her it would make her look guilty if she refused to sign the consent form. She also testified that the officers told her it would look better to DCFS if she signed the form. McKinney stated her child was with her when she signed the form so she knew officers had been inside her apartment prior to her signing the consent, but she did not know whether they had already searched her apartment or whether they found the weapon or any drugs inside her apartment at that time. Despite her testimony that she would not have signed the consent form but for the officers' representations, she knew she had the ability to refuse to sign.

3

After McKinney signed the written consent to search form and before a firearm was found inside the apartment, Officer Kaya spoke with defendant in Officer Kaya's squad car. Defendant told Officer Kaya he did not know anything about a shot fired inside the apartment. He told Officer Kaya he found the spent shell casing and put it in his pocket. Based on his demeanor, Officer Kaya did not believe defendant was telling the truth about the shot fired in the apartment and the spent shell casing. Defendant admitted to Officer Kaya he was a convicted felon. During the consent search of the apartment, the officers located a Springfield XD-40 firearm behind two boots on a shelf in a bedroom closet. Officer Kaya testified that based on the circumstances, if McKinney had not provided a written consent to search the apartment, he would have sought a search warrant.

## II. Analysis.

At the conclusion of the evidentiary hearing, the court asked the parties to focus their arguments primarily on the validity of Jennifer McKinney's written consent to search the apartment, the constitutionality of the "protective sweep" of the apartment, including how the doctrine of exigent circumstances may be implicated. The parties' briefs also address inevitable discovery. The court will consider each argument.

**A. Whether the "protective sweep" was permissible pursuant to defendant's arrest and/or pursuant to exigent circumstances.**

Preliminarily, the government notes, and the court agrees, that defendant's challenge to the protective sweep appears to relate solely to defendant's argument that McKinney's consent to search her apartment was tainted by an illegal entry. Because the evidence revealed the officers did not search the apartment during the sweep, nor did they discover the firearm during the sweep, the court agrees this challenge is limited.

"A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers and others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). The protective sweep is an exception to the prohibition under the Fourth Amendment against unreasonable searches and seizures within a person's home. *United States v. Starnes*, 741 F.3d 804, 807 (7th Cir. 2013). A protective sweep may also be proper where there is the existence of exigent circumstances. "The protective sweep is justified by the need, based on the facts known to a law enforcement officer, to ensure officer and bystander safety." *Leaf v. Shelnutt*, 400 F.3d 1070, 1087 (7th Cir. 2005) (citing *Buie*, 494 U.S. at 327). The search must be cursory, last no longer than is necessary to dispel reasonable suspicion of danger, and be justified by more than a "mere inchoate and unparticularized suspicion or hunch." *Buie*, 494 U.S. at 332, 335-36. The court's analysis is "exceptionally fact-intensive." *Starnes*, 741 F.3d at 808.

Defendant argues the officers' protective sweep of the apartment following his arrest was unreasonable and not justified. His argument rests upon the fact that he was arrested outside of the apartment and the circumstances did not reasonably warrant the officers in believing that the

4

apartment harbored an individual posing a danger to the officers or others. He further argues the information that a child was inside the apartment did not justify the sweep because any concern regarding a weapon being within the reach of a child was "mere speculation." The government argues the protective sweep was reasonable and warranted based on the information the officers had at the time.

The facts here revealed the officers immediately identified defendant as having an outstanding warrant for his arrest when they encountered him at the apartment following the 911 call for a shot fired from the area of the apartment. The officers searched the defendant incident to his arrest just outside the apartment on a porch landing and uncovered a spent bullet shell casing in the defendant's pocket. The officer did not find a weapon on defendant. During this encounter with defendant, he advised the officers there was a child inside the apartment. Officer Carpenter testified the officers called the child's name into the apartment but did not get a response back. Both Officer Carpenter and Officer Johnson testified they went into the apartment to conduct a protective sweep to attempt to locate the child and make sure there were no other threats in the apartment. During the course of their sweep (which lasted one to two minutes), the officers located McKinney's child on the couch in the living room. The officers did not see a weapon during the sweep, but did see what they thought might be drugs and drug paraphernalia. The officers left the apartment with only the child and brought him to his mother. The court credits their testimony.

Analyzing the protective sweep in light of defendant's arrest, the court turns to *United States v. Henderson*, 748 F.3d 788 (7th Cir. 2014). In *Henderson*, police responded to a domestic disturbance where it was reported that Henderson's ex-girlfriend was being held against her will at his home. *Id*. at 789. The police treated the report as a hostage situation and, through the use of a loudspeaker, demanded that Henderson exit the house. *Id*. After some time, the ex-girlfriend stepped out of the house and told police Henderson had a handgun in the house. *Id*. Fifteen to thirty minutes after she exited, Henderson voluntarily came out of the house and locked the door behind him. *Id*. Police handcuffed and arrested Henderson (outside of the house) and took him into custody. They did not find a weapon on him. *Id*. Approximately five to ten minutes after Henderson's arrest, police forced their way into the house and conducted a protective sweep. *Id*. They did not find anyone else in the house, but saw what they believed to be a marijuana grow operation in plain view. *Id*. at 789-90. In determining the reasonableness of the protective sweep under the Fourth Amendment, the court relied on the guidance of *Buie*. Like *Buie*, the Seventh Circuit found that based on the facts presented to the police, it was reasonable to conclude that the officers or others faced a dangerous situation without a protective sweep of the defendant's residence. Henderson argued on appeal that because the police officers did not confirm with the ex-girlfriend how many people were in the house, it was unreasonable for them to conduct a protective sweep. *Id*. at 792. In response to that argument, the court stated: "It is not realistic for police officers to always rely on the statements of people involved at a crime scene; they sometimes provide wrong information, or sometimes flat out lie." *Id*. The court found the protective sweep reasonable. *Id*. at 793. Here, like in *Henderson*, the court finds it was reasonable for the police to conclude that they were faced with a dangerous situation - report of a gun shot, an arrest of the defendant in possession of a spent shell casing, no weapon

5

recovered, and information of (at least) one other person inside the apartment. Under these circumstances, "the officers had the right to ensure their safety and the safety of everyone else in the area not only during the arrest itself but also during the remainder of the time that they were legally on the premises and its environs." *United States v. Burrows*, 48 F.3d 1011, 1017 (7th Cir. 1995).

Alternatively, in order to justify a protective sweep under the doctrine of exigent circumstances, "police officers [must] reasonably fear for the safety of someone inside the premises." *United States v. Collins*, 110 Fed. Appx. 701, 703 (7th Cir. 2004) (citing *United States v. Jenkins*, 329 F.3d 579, 581 (7th Cir. 2003)). "In such a situation, the need to protect or preserve life or avoid serious injury is justification for what would otherwise be illegal absent an exigency or emergency." *Collins*, 110 Fed. Appx. at 703. "The safety of others is a particular concern when police respond to a report of a crime in progress, and, in such a situation, police judgments regarding warrantless entries 'should be afforded an extra degree of deference.'" *Jenkins*, 329 F.3d at 581 (quoting *Reardon v. Wroan*, 811 F.2d 1025, 1029 (7th Cir. 1987)). The government has the burden to establish that the circumstances "as they appeared at the moment of entry would lead a reasonable, experienced law enforcement officer to believe that someone inside the house, apartment, or hotel room required immediate assistance." *United States v. Richardson*, 208 F.3d 626, 629 (7th Cir. 2000). Courts have recognized that 911 calls reporting emergencies can support a finding of exigent circumstances especially where the caller is identified. *Id. See also United States v. Drake*, 456 F.3d 771 (7th Cir. 2006) (court may presume reliability of a 911 call reporting an emergency situation for purposes of reasonable suspicion).

Defendant relies heavily on *United States v. Delgado*, 701 F.3d 1161 (7th Cir. 2012) to support his position that the officers were unjustified in entering McKinney's apartment for a protective sweep as well as under exigent circumstances to conduct a full blown warrantless search. Because the facts in *Delgado* are not on-point, the court is unpersuaded. In *Delgado*, the report was of shots fired in an alley. *Id*. at 1163. After the officers responded to the apartment where it was reported the shooter might be hiding, two men came out of the apartment. *Id*. Neither man indicated that anyone else was in the apartment. *Id.* The officers then went into the apartment without a warrant and conducted a search. *Id*. Here, for purposes of the validity of a protective sweep - either pursuant to defendants' arrest or exigent circumstances - the facts show the 911 caller reported hearing a shot fired from inside the upstairs apartment and when police made contact with defendant at the apartment, he reported to them a child was still inside the apartment. Additionally, police located a spent shell casing in defendant's pocket but no weapon. The court does not consider this a "close call." It was highly reasonable for the officers to conduct a protective sweep of the apartment to secure the child and identify any other persons inside the apartment, for their safety and the safety of any others. The information available to the officers at the time of the warrantless entry - the likely presence of a child inside a house with a potentially loaded firearm - was more than mere "speculation" or "hunch." Also, the testimony revealed that their sweep lasted only one to two minutes and no "full blown search" was conducted. The court finds defendant's arguments unavailing and the officers protective sweep of McKinney's apartment reasonable under exigent circumstances.

6

The court finds the protective sweep of McKinney's apartment was proper and, therefore, reasonable under the Fourth Amendment based on both incident to defendant's arrest and pursuant to exigent circumstances.

### B. Whether McKinney's consent to search was voluntary.

Defendant argues that McKinney did not voluntarily consent to a search of the apartment because it was tainted by the illegal "protective sweep," and was coerced through the officers' tactics. Defendant's position is that McKinney was aware, prior to providing the officers with a written consent to search her apartment, that the officers believed there was a firearm inside the apartment. Additionally, defendant contends McKinney's consent was tainted by the fact that she witnessed several officers going in and out of the apartment. Defendant also argues McKinney's consent was coerced because officers told her DCFS would be notified and that it would be in her best interest to provide consent because refusing consent may look incriminating.

Whether a consent in voluntary is dependent upon the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248 (1973). The Seventh Circuit has described the process by which district courts are to determine whether consent to a search was voluntary.

> The government bears the burden of demonstrating by a preponderance of the evidence that consent to search was in fact voluntarily given, and not the result of duress or coercion, express or implied. The Government bears the burden of proving that consent freely and voluntarily was given. *United States v. Johnson*, 495 F.3d 536, 541 (7th Cir.2007). To determine whether a defendant voluntarily consented, a district court should consider "the totality of the circumstances, including [the defendant's] age, education and intelligence; whether he was advised of his constitutional rights; how long he was detained prior to consent; whether he consented immediately or after police made several requests; whether the police used physical coercion; and whether he was in custody." *United States v. Ruiz*, 785 F.3d 1134, 1146 (7th Cir.2015).

*United States v. Contreras*, 820 F.3d 255, 269 (7th Cir. 2016).

Here, the facts show McKinney was 27 years old at the time of consent, had a high school diploma, and could read and write English. McKinney did not recall whether Officer Kaya advised her she had the right to refuse consent (Officer Kaya testified while he could not recall all the details of his conversation with McKinney, it was his usual practice to advise of the right to refuse), however, she testified that she knew she could refuse consent. The written consent form contained the language "I understand and have been informed by at least one of the undersigned officers that I have a right to refuse this consent." (Yet, police failing to advise of the right to refuse consent is not fatal to the government's proof of voluntary consent. *See Schneckloth*, 412 U.S. at 249.) She was never under arrest, in police custody, or surrounded by multiple police officers. McKinney signed the consent form in the driveway in front of her apartment in the presence of her six year old child. According to the testimony of Officers Kaya and Johnson, McKinney provided the signed consent form after Officer Kaya's first request.

7

Both officers testified they spoke with McKinney regarding the consent form for less than 15 minutes.[2] No police officer used physical coercion in their contacts with McKinney.

The fact that McKinney signed a written consent form for the search of her apartment "weighs heavily toward finding that h[er] consent was valid." *United States v. Taylor*, 31 F.3d 459, 463 (7th Cir. 1994). *See also United States v. Duran*, 957 F.2d 499, 502 (7th Cir.1992) (noting that signed consent form, informing defendant that she had a right to withhold consent, weighed heavily in favor of finding her consent voluntary).

First, defendant argues McKinney's consent was tainted by the fact that she saw officers going in and out of her apartment at the time she was confronted with the consent form. However, McKinney testified that she was not aware if the officers had "already gone through the apartment" at the time she signed the consent form. She testified that she saw police officers going up and down the stairs to her apartment and that there were a lot of police cars outside of the apartment, but all she knew for certain was that a police officer had brought her child to her (who had previously been inside the apartment). She was not able to see the door going into her apartment from where she was standing in the driveway. Accepting McKinney's testimony here as credible, and considering the finding that the protective sweep was reasonable, there is not enough evidence to show that McKinney's consent was tainted by the sweep.

Next, defendant argues that the consent was not valid because McKinney was told by one of the police officers that DCFS would be called concerning the incident and that it would be in her best interest to sign the consent form. Additionally, McKinney testified the officer told her it might make her look guilty if she did not sign the form. Officer Kaya testified he did not recall specifically what he said to McKinney, but it was his practice, as a mandated reporter under law, to contact DCFS in cases where he believed a child may be in danger. He further testified he would not make any representations to the parents about what DCFS may or may not do, just that they may investigate further. Officer Kaya did not recall telling McKinney that not signing the consent form would look incrimination or make her look guilty. He did testify that those are not the kinds of things he tells people when seeking consent. Officer Johnson testified he did not make any threats to McKinney, did not tell her it would be in her best interest to sign the form or that she would look guilty if she did not sign it. He also testified he did not hear Officer Kaya say any of these things.

The court finds the officers' testimony credible and does not find that McKinney was coerced to sign the written consent form through improper police tactics. First, the court does not find Officer Kaya's conversation with McKinney regarding his likely report to DCFS to be a coercive tactic. As a mandated reporter, Officer Kaya would be required to contact DCFS if he believed a child may be in danger (here, the facts support that assumption). Advising McKinney

---

[2] Officer Kaya testified he arrived at the scene at approximately 9:30 p.m. The officers and McKinney agree that she noted the time on the consent form as 9:38 p.m. McKinney testified she was speaking with the officers for perhaps a half hour before she signed the form. The court credits the officers' testimony that it was only a short period of time before McKinney's consent was obtained.

8

of this fact does not render her consent to search under duress. *United States v. Santiago*, 428 F.3d 699 (7th Cir. 2005) (district court did not err in finding written consent search given freely and voluntarily despite defendant's position that it was based on express or implied threats that his children would be taken into custody). *See also United States v. Hernandez*, 341 F.Supp.2d 1030 (N.D. Ill. Oct. 21, 2004) (police officer's accurate statement that DCFS would be called was not improperly coercive). Second, the court finds no credible evidence that the officers made threats to McKinney or told her she would look guilty if she did not sign the consent form. Specifically, McKinney testified she knew she could refuse to sign the consent form. Also, by all accounts, the time McKinney spent with Officers Kaya and Johnson was brief and no testimony was presented that the officers harassed or intimidated McKinney during that time. To the extent there is any difference in the officers' version and McKinney's on this issue, the court credits the officers' testimony.

For the foregoing reasons, the court finds that after considering the "totality of the circumstances," defendant's consent was not involuntary. *See Contreras*, 820 F.3d at 269. As such, defendant's argument for suppression on the grounds of involuntariness must be denied.

### C. Applicability of doctrine of inevitable discovery.

Because the court has found that McKinney's consent to search the apartment was valid, a finding on the parties' arguments regarding the doctrine of inevitable discovery is unnecessary.

For the foregoing reasons, the court finds that the protective sweep of Jennifer McKinney's apartment was valid pursuant to defendant's arrest and also under the doctrine of exigent circumstances. The court further finds Jennifer McKinney's consent to the search of her apartment was valid. As such, all areas that the officers searched, including the bedroom closet in which the firearm was found, were within the scope of that consent. Defendant's motion to suppress [41] is therefore denied.

Date: 5/11/2018         ENTER:

*Philip G. Reinhard*

United States District Court Judge

Electronic Notices. (LC)